**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**TIMREE BROWN,**

                      **Plaintiff,**

                v.                                5:06-CV-188
                                                             (FJS/GHL)

**LINDA MACKAY, BRENDA FORREST,**
**DR. PHILIP GOVER and CAYUGA**
**COMMUNITY COLLEGE,**

                      **Defendants.**

---

**APPEARANCES**                                  **OF COUNSEL**

**O'HARA & O'CONNELL**                **DENNIS G. O'HARA, ESQ.**
7207 East Genesee Street
Fayetteville, New York 13066
Attorneys for Plaintiff

**OFFICE OF MATTHEW R. FLETCHER**    **RANDY J. RAY, ESQ.**
5933 Lake Street Road
P.O. Box 240
Cayuga, New York 13034
Attorneys for Defendants

**SCULLIN, Chief Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      Currently before the Court is Plaintiff's motion, pursuant to an Order to Show Cause, for a preliminary injunction requiring Defendants to offer Plaintiff the immediate opportunity to complete a five-hour clinical to satisfy the requirements for completion of Defendant Cayuga Community College ("CCC")'s Nursing 101 curriculum and, upon successful completion thereof, to admit Plaintiff to CCC's Nursing 102 curriculum during the pendency of this action. Plaintiff

also requests that the Court require Defendants to make reasonable accommodations for her medical conditions as the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 require.

The Court heard oral argument in support of, and in opposition to, Plaintiff's motion on February 21, 2006. At the close of argument, the Court reserved decision and informed the parties that a written decision would be forthcoming shortly. The following constitutes the Court's written disposition of Plaintiff's motion.

## II. BACKGROUND

Plaintiff was a first-year student in Defendant CCC's Nursing Program until Defendants dismissed her from that program on January 12, 2006.[1] The first year of Defendant CCC's Nursing Program is divided into two fifteen-week semesters: the first fifteen-week semester is designated as Nursing 101 and the second fifteen-week semester is designated as Nursing 102. The Nursing 101 Program has three components: classroom studies, clinical lab requirements, and clinical rotation requirements. Plaintiff completed her first semester classroom studies with a straight B average, and she also successfully completed all required labs.

Each of the clinical rotations required to complete Nursing 101 are five weeks in duration, although there is no rotation for the initial five-weeks of the semester. Thus, Nursing 101 has two clinical rotations; and Nursing 102 has three clinical rotations. Plaintiff's assignment for the first rotation was at Finger Lakes Center for Living in Auburn, New York (the

---

[1] Defendant CCC informed Plaintiff that she could challenge her dismissal by filing a grievance under the academic grievance procedure authorized under Defendant CCC's policies.

"Center"). Her assignment for the second clinical rotation was at Community General Hospital in Syracuse, New York.

Plaintiff successfully completed her first clinical rotation but received an incomplete in the second clinical rotation because she was absent for ten hours (two five-hour clinical rounds) because of illness. The Student Handbook for the Nursing Program provides for make-ups of the clinical rotations that students miss. Defendant CCC informed Plaintiff that she would be able to make up the clinical rounds that she missed during the break between the fall and spring semesters, i.e., in the break between Nursing 101 and Nursing 102.

Plaintiff telephoned Defendant Mackay, an Assistant Professor of Nursing and one of Plaintiff's instructors, who was also a class facilitator for Nursing 101, to confirm the details of the make-up clinical rounds. On either January 5, 2006, or January 6, 2006, Defendant Mackay told Plaintiff that her make-up clinical rounds were scheduled for January 10, 2006, and January 11, 2006, at the Center. She also told Plaintiff that the identity of the patient assigned to her for the make-up clinical rounds would be posted on the bulletin board at the Center on January 9, 2006. Therefore, Plaintiff went to the Center on that date to ascertain the identity of the patient, at which time, she recognized him as someone whom she had previously met during her first clinical rotation at the Center.

One requirement of the clinical rotation is that the student conduct patient-specific research before beginning the clinical round. This research consists of meeting the patient, reviewing the chart, reviewing medication instructions, and completing various forms. Plaintiff's practice was to conduct her patient research the day before her clinical round.

Plaintiff completed a preliminary review of the patient's chart on January 9, 2006, and

decided to complete the rest of her patient research on January 10, 2006, prior to her clinical round, because of the short notice that Defendant CCC provided as to the patient's identity and because she had previously made a financial commitment to participate in a prior engagement on January 9, 2006.[2]

On January 10, 2006, Plaintiff left her home at approximately 5:30 a.m. so that she could arrive at the Center in sufficient time to complete her patient research. However, she was involved in an automobile accident before she reached the Center and, therefore, did not arrive until 8:00 a.m., which was too late for her to perform the clinical rotation that day. Nonetheless, she remained at the Center and completed her patient research in preparation for performing a clinical round on the next day, which she did.

On January 13, 2006, Plaintiff called Defendant Mackay because she had not received word as to when she could make-up the final five-hour clinical round that she needed to complete Nursing 101. During that conversation, Defendant Mackay informed Plaintiff that she had been dismissed from the Nursing Program. Plaintiff also received a written notice from Defendant Mackay, dated January 12, 2006, which informed Plaintiff that she would not be able to matriculate to Nursing 102 because (1) she had not successfully completed the clinical hours for Nursing 101, (2) she was not prepared to take care of an assigned patient safely, (3) she had failed to identify the patient prior to medication administration, and (4) she had left the patient's bed in a high position.

Defendants provided Plaintiff with a post-deprivation right to grieve the decision to

---

[2] According to Defendants, Plaintiff told them that she went snowboarding on the night of January 9, 2006. *See* Defendants' Memorandum of Law at 4.

dismiss her from the Nursing Program pursuant to Defendant CCC's "Standard Grievance Process: Academic Issues." Under this procedure, Plaintiff was allowed to have one person accompany her to the grievance hearing; however, that person could not speak or otherwise participate unless the Chairperson of the Grievance Committee invited her to do so. Moreover, Defendant CCC denied Plaintiff's request to obtain a copy of her student records prior to the grievance hearing, although it did allow her to review her file during the hearing. In addition, Plaintiff contends that at the hearing Defendant Mackay and Defendant Forrest introduced new and different reasons for her dismissal from the Nursing Program. The Grievance Committee's role was to make a recommendation to another administrator, Defendant Dr. Philip Gover, who made the decision to deny the grievance. Defendant Gover was not present at the grievance hearing and did not personally hear testimony, review documents, or evaluate witness credibility. Moreover, there was no transcript of the hearing for Defendant Gover to review before making his decision. Nor did the Grievance Committee make any findings of fact or provide Defendant Gover with any explanation, in writing or orally, of the reasons for its decision to deny Plaintiff's grievance. Plaintiff received the decision to dismiss her from the Nursing Program by mail on or about January 13, 2006. On February 10, 2006, Plaintiff filed this action against Defendants and, at the same time, filed a motion for a preliminary injunction.

### III. DISCUSSION

**A.        Preliminary injunction standard**

"A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii)

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995) (citations omitted). However, when "an injunction will alter, rather than maintain, the status quo, . . ." courts hold the movant to a higher standard. *Id.* at 33-34. Courts refer to this latter type of injunction as "mandatory" because it "command[s] some positive act." *Id.* at 34 (citation omitted). A court will grant a mandatory injunction "'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.* (quotation and other citations omitted). "The 'clear' or 'substantial' showing requirement . . . thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Id.* (citation omitted).[3]

### *1. Irreparable harm*

Plaintiff argues that, because she has alleged a violation of her liberty and property rights under the Due Process Clause of the Fourteenth Amendment, she has established that she will suffer irreparable harm if the Court denies her motion. Alternatively, Plaintiff asserts that her allegations regarding the loss of educational opportunities also constitute irreparable harm. Finally, Plaintiff argues that, due to the application process and semester start dates, the earliest

---

[3] Neither party discussed whether the preliminary injunction that Plaintiff seeks is prohibitory or mandatory. However, if this Court were to grant Plaintiff's motion, it would change the status quo by requiring Defendants to take an affirmative action – readmitting Plaintiff to Defendant CCC's Nursing Program. Therefore, the Court concludes that Plaintiff is requesting a mandatory injunction and the higher standard – substantial showing of a likelihood of success on the merits – is applicable. Finally, the Court notes that when it raised this issue with counsel at oral argument, neither objected to the Court's application of the higher standard.

she could begin studying at another institution is September 2006, and it is unlikely that another institution would accept her as a student in light of the fact that she has been dismissed from Defendant CCC.

Although Plaintiff is correct that a violation of a constitutional right, standing alone, is generally sufficient to establish irreparable harm, Plaintiff has not sufficiently alleged such a violation. Although she states that Defendants violated her property and liberty rights under the Constitution, she has not alleged any facts to support her allegations. As the Court discusses *infra*, Plaintiff has not alleged the basis for her allegation that her seat in the Nursing Program constitutes a property interest under New York law nor has she demonstrated that Defendants have taken any action that would "stigmatize" her or prevent her from seeking admission to another college or nursing program, thereby encroaching on her liberty interests. Accordingly, the Court concludes that Plaintiff has failed to demonstrate that she will suffer irreparable harm in the absence of a preliminary injunction.

### *2. Substantial likelihood of success on the merits*

Based upon its conclusion that Plaintiff has failed to establish irreparable harm, the Court need not address the second prong of the preliminary injunction test in order to deny her motion. However, in the interest of completeness, the Court will do so.

#### *a. Rehabilitation Act and ADA claims*

Section 504 of the Rehabilitation Act of 1973 provides, in pertinent part, that

> [n]o otherwise qualified individual with a disability in the United

> States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794.

The ADA provides similar protections for the disabled. *See* 42 U.S.C. § 12132; *Hope v. Cortines*, 872 F. Supp. 14, 20 (E.D.N.Y.), *aff'd*, 69 F.3d 687 (2d Cir. 1995) (holding that "Title II of the ADA simply extends section 504 to all programs and services provided by state and local governments").[4]

To establish a *prima facie* case under either § 504 or the ADA, a plaintiff must demonstrate "(1) that she is an individual with a disability within the meaning of the statute; (2) that defendant had notice of her disability; (3) that she was otherwise qualified to meet the program requirements; and (4) that defendant refused to make reasonable accommodations." *Harnett v. Fielding Graduate Inst.*, 400 F. Supp. 2d 570, 576 (S.D.N.Y. 2005) (citation omitted).

Plaintiff asserts that she suffers from ITP, clinical depression and Lupus, which cause her to experience fatigue, interfere with concentration, and render her vulnerable to other illnesses.

---

[4] Both Section 504 of the Rehabilitation Act and the ADA define a "disabled individual" as any one who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B); 42 U.S.C. § 12102(2).

The regulations promulgated under Section 504 define a physical or mental impairment to include any psychological disorder or condition, any mental or psychological disorder and learning disabilities. *See* 34 C.F.R. § 104.3(j)(2)(i). The key factor in determining whether a person is an "individual with handicaps" within the meaning of Section 504 is whether her physical or mental impairment results in a substantial limitation of one or more major life activities. Major life activities include functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. *See* 34 C.F.R. § 104.3(j)(2)(ii).

She also claims that her various medical conditions fit into the category of a hidden disability because her symptoms are generally not visible or apparent.[5] Moreover, she contends that her medical conditions clearly affect her ability to attend clinical rounds that require her to be healthy while attending to elderly patients and that, because Defendants dismissed her from the Nursing Program for failing to complete five hours of her clinical rounds, she has satisfied the elements of her Section 504 and ADA claims.

Defendants do not dispute that Plaintiff's medical conditions constitute disabilities within the meaning of § 504 and/or the ADA. Nonetheless, she has failed to set forth a *prima facie* case for two reasons: (1) Defendant CCC did not have notice of her disability and (2) Defendant CCC never refused to provide her with reasonable accommodations. At oral argument, Plaintiff's counsel acknowledged that, although Plaintiff verbally mentioned her medical conditions to a member of the faculty, she did not follow Defendant CCC's procedures for notifying Defendant CCC of her disability. Moreover, Plaintiff does not deny that, at the beginning of the school year, she received a pamphlet entitled "Information for Students with Disabilities" which informed students of their rights under the ADA and § 504, and that this policy is read to every student in Nursing 101. *See* Affidavit of Philip Gover, sworn to February 14, 2006, at Exhibit "B."[6] In addition, other than an opportunity to make-up the clinical rotations – which Defendant

---

[5] The United States Department of Education Office of Civil Rights in its information regarding "The Civil Rights of Students with Hidden Disabilities" provides that "[h]idden disabilities are physical or mental impairments that are not readily apparent to others. They include such conditions and diseases as specific learning disabilities, diabetes, epilepsy, and allergy. . . ." *See* Plaintiff's Memorandum of Law at 15.

[6] The pamphlet provides that "[s]tudents with disabilities needing accommodation should contact the appropriate disability services personnel, . . ., as early as possible to make

(continued...)

CCC provided to her – Plaintiff does not dispute that she never asked Defendant CCC for an accommodation. Accordingly, based upon this record, the Court concludes that Plaintiff has not shown a substantial likelihood of success on her § 504 and ADA claims.[7]

### b. Due process claim

As a preliminary matter, "[t]o be entitled to the procedural protections of the Fourteenth Amendment, [a plaintiff] must . . . demonstrate that her dismissal from the school deprived her of either a 'liberty' or a 'property' interest." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 82 (1978). Since "property interests are creatures of state law, . . ., [in a case such as this one, a plaintiff must] show . . . that her seat at [CCC] was a 'property' interest recognized by [New York] state law." *Id.* To demonstrate a liberty interest, a plaintiff would have to show that the school's decision to dismiss her somehow imposed a stigma on her that foreclosed her from

---

[6](...continued)
arrangements for specific, individual assistance." *See* Exhibit "B"(under "General Assistance"). With respect to "academic accommodations," the pamphlet further provides that "[t]o have equal access to, and the opportunity to participate fully in, the College's programs and activities, some students require academic accommodations. It is important that all parties understand that accommodations do not guarantee academic success, nor do they provide an advantage to the student." *See id.* (under "Academic Accommodations"). Finally, the pamphlet makes clear that to receive accommodations, "students must [i]dentify the disability, as early as possible, to the disability services personnel. . . . When identifying, provide the appropriate disability services personnel with the required current documentation for the student's particular disability. In order for the college to provide appropriate and timely accommodations, the student needs to meet with disability services personnel at the beginning of each semester to develop an appropriate and reasonable plan for accommodations and other recommended services." *See* Exhibit "B" (under "To Receive Accommodations").

[7] The Court notes that there is no individual liability under either § 504 or the ADA and, thus, there is no way that Plaintiff could success on her § 504 and ADA claims against Defendants Mackay, Forrest, and Gover. *See Harnett*, 400 F. Supp. 2d at 575.

enrolling in another college or another school of nursing. *See id.*

In the present case, Plaintiff has not cited any legal basis to support her allegation that she has a property interest in her seat in the Nursing Program. Nor has she come forward with any facts to support a finding that Defendant CCC deprived her of a liberty interest. Although she contends that, in light of her dismissal from Defendant CCC's Nursing Program, she will find it difficult to enroll in another such program, she has not pointed to anything that indicates that Defendant CCC has ever publicized the reasons for dismissing her from its Nursing Program. *See Horowitz*, 435 U.S. at 84 (noting that "[i]n *Bishop v. Wood*, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976), [the Court] upheld the dismissal of a policeman without a hearing . . . [and] rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a sigma infringing one's liberty . . . .").

Alternatively, even if the Court were to assume the existence of a liberty interest, Plaintiff has not demonstrated that Defendant CCC failed to provide her with all of the process to which she was due. In fact, the record demonstrates that Defendant CCC provided her with more process than was constitutionally required.

It is well-established that, in cases involving academic dismissals, courts may not overturn an academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (citation omitted). Moreover, in *Horowitz*, the Supreme Court made clear that a hearing is not required as part of the academic dismissal process. *See Horowitz*, 435 U.S. at 90 (stating that the Court would not "formalize the academic dismissal process by requiring a hearing.").

In the present case, Defendant CCC provided Plaintiff with written feedback on more than one occasion that her clinical work was not satisfactory. *See* Affidavit of Vicki Condi, sworn to February 14, 2006, at Exhibit "6" & Exhibit "7." Moreover, although not constitutionally required to do so, Defendant CCC provided Plaintiff with an opportunity to grieve her dismissal and to attend a hearing related to that grievance. *See* Complaint at Exhibit "D." In addition, Defendant CCC went even further by affording Plaintiff's father the opportunity to discuss the situation with Dr. Dennis Golladay, the President of Defendant CCC. Based upon this record, the Court finds that no reasonable factfinder could conclude that Defendant CCC's decision to dismiss Plaintiff from its Nursing Program was arbitrary or capricious; i.e., that it was not based upon the exercise of professional judgment. Accordingly, the Court holds that Plaintiff has not demonstrated a substantial likelihood of success on the merits of her due process claim.

### III. CONCLUSION

Accordingly, after carefully reviewing the entire record in this file, the parties' submissions and oral arguments, and for the reasons stated herein as well as at oral argument, the Court hereby

    **ORDERS** that Plaintiff's motion for a preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 9, 2006
       Syracuse, New York

                                               Frederick J. Scullin, Jr.
                                               Chief United States District Court Judge